May it please the Court. My clients, plaintiffs and appellants, Zenon Health and Dr. Haroon W. Chowdhury, are appealing the District Court's order in this case granting summary judgment to defendant and appellant defendant and appellee Mirza Baig on counts 1, 2, and 6 of plaintiff's amended complaint, which was then followed up by final judgment. In that memorandum and order, the District Court erroneously held that, as a matter of law, the three contracts at issue in this action were each illegal and void under the Texas Medical Practice Act. The District Court therefore held that plaintiffs could not pursue their claims against Mr. Baig for tortious interference with contract and conspiracy to induce breach of contract. Now, the three separate contracts at issue in this case are each unique and different and had different purposes. There was a purchase and sale agreement between Dr. Chowdhury and Dr. Ali Khan, which was not supposed to go into effect until such time as Dr. Chowdhury obtained his license to practice medicine in Texas. That corresponds to count 2 and count 6 in part? That corresponds to count 1 and count 6 in part, yes. The PSA is count 1? The PSA is count 1. The exclusive management services agreement between Xenon and Xenon Texas is count 2, Your Honor. Okay. What's wrong with the District Court's analysis that these contracts are interrelated and should all be read together as essentially a single contract? The problem with that analysis, Your Honor, very simply, is that you had different contracts that were supposed to go into effect at different times and there was nothing to prevent each of the contracts from operating independently. So, for example, we plaintiffs agree that the most problematic contract is the exclusive management services agreement. Having said that, even if there was no exclusive management services agreement, even if that agreement were to be invalidated by Your Honors, which we think you should not do, and I'll get to that in a bit, the purchase and sale agreement should still apply and should still be found to be a valid contract under the Texas Medical Practices Act because there was nothing in that agreement and there's nothing in the equity interest assignment agreement, which was an exhibits agreement, that allows for the unauthorized practice of law. It's no different than saying, I'm an outsider. I want to purchase your practice. We're entering into an agreement and sometime down the road, when I get my license, I'm going to purchase that practice. So it seems to me that to argue that they were all inextricably intertwined without supplying any evidence, without doing anything more than reading these agreements, which could have been in effect at different times and which, in fact, had different start dates, at the very least, Judge Werlein was ignoring the evidence that we put forward before him. At the very least, there's a disputed issue of fact as to whether they were, in fact, inexplicably intertwined. Our position, and we repeated it, is that two of the agreements could not and would not go into effect unless and until Dr. Chowdhury obtained his Texas medical practice license. So from our perspective, and we believe this is our strongest and strongest argument, regardless of what the Court does with the exclusive management services agreement, the purchase and sale agreement and the equity interest assignment agreement in no way called for the unauthorized practice of medicine. In fact, as we cited in our papers, prior to Judge Werlein even dealing with this in the companion cases and the Texas State action, the Texas trial court held that the purchase and sale agreement was a viable contract, ignoring or rejecting the affirmative defense raised by Dr. Ali Khan, similar to the claim that's being raised here by Defendant Baig. But that time, though, Dr. Chowdhury had been licensed, had he not? That is correct, Your Honor, but it doesn't really change the whole point. The argument was that the agreement was an agreement that violated the Texas Medical Practice Act, and therefore it was illegal, regardless of the time as to whether or not Dr. Chowdhury had gotten his license. So although you — But it's illegal at the exception or not, is your point? Exactly. So — Particularly the way that it was analyzed by Judge Werlein, because Judge — He argued expressly to the State courts that it was illegal at the inception. I think it's unclear, Your Honor. Having — to be perfectly frank, having said that, it is — it is clear that the argument was that this was illegal. It wasn't an argument that it was illegal because Dr. Chowdhury had not yet obtained his administrative license. The argument was that this was an illegal agreement, and if you were to look at the motion for summary judgment and the papers in opposition, I believe that that's — it's not clear, but I believe that that's the argument. Why would the management agreement violate Texas law? I mean, I guess this is sort of a friendly question, because it appears that it's administrative and operational, the one that went into effect before — I'm trying to figure out how that's practical in Edison. That's — that's our position. That's our position, Your Honor, that — and in fact, our position is that it was only operational, that there was no violation of the practice of medicine, that the situation — Did the court find anything in there that was practice of medicine in the management agreement? I believe what the Court said, Your Honor, and I sort of don't really want to answer a question that's undermining my case, but I'll be — but I'll be honest, I believe what the district court said was that the certain fees and certain control over what was going to go on in the anesthesia services were to be controlled by Dr. Chowdhury, and therefore Dr. Chowdhury and or — let me — actually, not Dr. Chowdhury, therefore Xenon Health of — Xenon Health, LLC, was somehow controlling the practice of medicine. Having said that, the only case that the district court cited to — to support its position was the Flynn case, and the Flynn case is distinguishable for several different reasons. Reason number one, because if you look at the whole purposes underlying the Texas Medical Practice Act that have been advanced by various courts and we're talking now about — Before you launch into the multiple reasons, is your argument that there's an issue of material fact as to whether there was control under Flynn and Gupta, or is your argument a legal one, that because he's a licensed physician, he was a professional medical corporation? What was the — what's the argument you're making now and what did you make below? I think the argument we're making both now and below is that because he was a licensed physician, therefore, as a matter of law, the purposes underlying the act that the courts discussed in Gupta, in Flynn, in Garcia, simply don't apply here. And yet the text says licensed by the board or in the State, just the text of the statute. Correct. And you don't dispute that he wasn't, at least for purposes of the medical practice? Correct. I — I — I do not — How do we get around whether the purpose — you have strong, intuitive arguments and people have criticized this doctrine and law — but nonetheless, you've got a statute which, it's plain language, seems to confirm that he wouldn't have been licensed by the board, the Texas board. Well, not that he wouldn't have been licensed. He wasn't. He wasn't licensed, Your Honor. And we do not dispute that, Your Honor. And we will concede — So if you lose on the law, then you have — you concede as to count whichever the two — We would concede that if you're not applying the, shall we say, purposes doctrine, then, yes, he certainly was — Dr. Chowdhury certainly was not licensed at the time, and then the question becomes what Judge Elrod said, whether or not there's anything in the exclusive management services agreement that would, in fact, constitute the unauthorized practice of corporate medicine, such as to invalidate the agreement. Didn't the district court say that was a sham, that paying $750,000 for the little book of business he had was obviously just for appearance sake? Well, that was the argument, Your Honor, and I will admit that this is — That's what the district court held. That is what the district court held, Your Honor. But the district court somehow attempted to apply that across the board. And regardless of whether or not the payment that was due under the exclusive management services agreement was or was not a sham — and it's our position, although I admit this is not very well on the record, that in fact that number wasn't chosen out of thin air. There were attempts to try to get contracts that didn't happen. They thought it was going to happen. But that doesn't defend our position. There's nothing in the purchase and sale agreement, and there's nothing in the equity interest assignment agreement that's a sham. It's a normal — it's a normal and regular transaction. I'm agreeing with a Texas doctor that that Texas doctor is going to start a practice, and at some point down the road, when I become licensed, I will then be assigned the right to purchase this particular medical practice from, in this case, Dr. Ali Khan. And, in fact, as we made very clear in the record, eventually in the Texas state courts, the equity interest assignment agreement was signed by Dr. Ali Khan when Dr. Chowdhury did obtain his license. Roberts. Those state court rulings came in in the motion to reconsider? So they were in the record? Is that when they first came in? Well, no. Actually, Your Honor, the state court ruling at the trial court level enforcing the turnover order actually — actually came in before Judge Werlein ruled on the motion for summary judgment. Was it a contempt hearing, for example? Is that in this record? Yes, it is, Your Honor. The only thing that happened after briefing here is that both the Texas court of appeal in — under two different situations actually affirmed the trial court's ruling. Both the ruling on summary judgment in the trial court in the Texas state action with respect to whether or not the purchase and sale agreement was a binding agreement, as between Dr. Chowdhury and Dr. Ali Khan, and also the Texas court of appeal furthermore affirmed the ruling of the Texas state court, trial court as to the turnover order. And we deal with some of that in our reply brief. We also deal with one of those in one of our Rule 28J letters. So if these other courts had — did they consider this sham argument at all, ever? Because it seems that if the sham argument had worked in any of these courts, all of those other things would have gone away. Well — I'm just trying to figure out which ones of those would survive if the court would have seen it like the district court here. I guess — I don't know the answer to that, Your Honor, because I have a problem with what you're saying, which is this. The sham argument understandably could invalidate the — the exclusive management services agreement, because that was a $750,000 fee. I don't see how, even if the payment in that agreement was a sham, how it could possibly invalidate either the purchase and sale agreement or the exclusive purchase and sale agreement or the equity interest assignment agreement. I'm not trying to get into — I'm asking, did the — those other courts in Texas ever look at the sham argument? Not as far — not as far as I know, Your Honor. They were focusing solely on the purchase and sale agreement or the equity interest assignment agreement, because Zenon, Texas, was in bankruptcy. How do you characterize the net collections in the purchase and sale agreement? Fees for medical services or something different, and why? I would characterize those as fees for medical services that were provided beforehand, and that's not — and that's not in any way a violation of the unauthorized corporate practice of law. First of all — For those provided by Dr. Kahn? I'm sorry? For those medical services provided by Dr. Kahn? There were medical services provided during the time that Dr. Ali Kahn was in control of Zenon, Texas. At least he was the paper owner. Isn't that how Dr. Chaudry characterized Dr. Kahn's interest? Well, he — he said that he wasn't necessarily in control, yes, but he also said he didn't know whether the $750,000 was reachable. And in fact, Dr. — in fact, Dr. Ali Kahn — the payments to — the payments to Dr. Ali Kahn, if anything, were to pay him for whatever medical — for whatever was done during the time that he was in control. And it's also not unusual when you have a — At what point was he in control of anything? I mean, the — the management agreement put — put the control in Chaudry? Well, he was — he was certainly the person in charge — in charge as he was — He had his feet on the ground. Correct. Correct, Your Honor. What else? I mean, everything else was controlled by Chaudry, it seemed to me, under the contract. Well, everything else — well, one could certainly argue that under the exclusive management services agreement, everything — the actual practice — what was going to happen in anesthesia — in provision of anesthesia services was going to be controlled. Dr. Chaudry could enter into agreements, whether in fact he would or whether Dr. Ali Kahn would. That's — you know, there's no evidence in the record of it, and I understand how you're reading the agreement. Having — having said that, it is not unusual for agreements to have similar definitions when you're doing a lot of corporate agreements. And it is also — there seems to me to be nothing unauthorized about having an agreement that allows for the purchase and sale of a medical practice based upon whatever business went on before and based upon whatever net collections. If there were, fine. If there were, there weren't. And that may be a problematic contract in terms of the amount, or maybe there's some other contractual issue there, but that's not the issue in this case. The issue in this case is whether the purchase and sale agreement provided for the unauthorized practice of corporate medicine. And to me it seems that a transaction whereby Dr. A sells his practice to Dr. B does not call for that. And I see my time is up. Roberts.  Okay, Mr. Sherry. Why don't you start off with the purchase and sale agreement and tell us why that should be viewed as inextricably intertwined with these other agreements. Yes, Your Honor. Well, I think that the appellant freely admitted that this was all part and parcel, part of the same transaction. And Judge Warline noted that in his opinion in the record at page 1199. The appellants noted in their amended complaint at page 96 and 97 of the record that essentially they needed all of these things to happen to accomplish their objective, which was they were expanding business into Texas. They had two specific clients already lined up in Texas that they wanted to take advantage of. But Dr. Chaudry was not going to get his license until whenever. And so they wanted to be able to take advantage of the ability to profit and do business and essentially craft a legal end runaround of the act, which they were cognizant of. But they had failed to do that. How did the purchase and sale agreement fit into that picture, though, if it wasn't triggered until after Dr. Chaudry had his license? Well, two things, Judge Davis. First, the purchase agreement itself did have some conditions that took effect immediately, specifically indicated that the seller could not take any distributions or any dividends until the closing took place. Also indicated that the seller could not institute any legal action, that the seller could not make any changes to the ownership structure of the company. So the purchase agreement is still tied back to the management and services agreement because the whole idea was, and these are appellants' own words, that Dr. Chaudry was going, I'm sorry, Dr. Kahn was going to temporarily own Xenon Texas. The idea is that Dr. Kahn wasn't going to keep it permanently. He was going to have to give up control. And the person who had control of that was Dr. Chaudry and also his entity, Xenon Health. So the purchase agreement itself also is inextricably intertwined with the equity agreement because the purchase agreement, as one of its conditions, says that at closing the seller has to present a signed equity agreement. So those two are married together. You can't achieve the purpose of Xenon and Dr. Chaudry ensuring that they can go back and take over the Xenon Texas and all those clients that they wanted to profit from. They needed to ensure that once he got his license. So for those reasons, Your Honor, I think Judge Werlein acknowledged all of that and clearly showed that these were inextricably intertwined. And there's really been no evidence that's been cited by the appellants in their brief to the contrary. They just point to the language of the agreements themselves and say that that should be enough for this court. But Judge Werlein went beyond that and considered things like what you noted, Judge Davis, that Dr. Chaudry freely admitted that Dr. Kahn was simply a paper owner of Xenon Texas. Didn't he own Xenon Texas at all times? So the corporation didn't actually employ licensed physicians to treat patients and receive a fee for that treatment because Dr. Kahn owned Xenon Texas at all the relevant times. Judge Elrod, it is true that Dr. Kahn owned Xenon Texas at all relevant times, but I think the pertinent analysis here from the cases like Garcia and Gupta and Flynn in particular is that we have to look at the control aspect. No one has denied the fact that Xenon Texas was practicing medicine by providing these anesthesia services. So the next step is was it simply an alter ego, essentially a straw man, which is what was determined in the case of Flynn where terms like paper owner were used in that. But the question is was there such pervasive control by Xenon and Dr. Chaudry over Xenon Texas that its practice of medicine really is just imputed to Dr. Chaudry and to Xenon? Okay, did Dr. Chaudry pick his own, I mean Dr. Kahn have his own staff to perform the medical services during the relevant time period? Your Honor, he didn't have the ability to choose who that staff was. It was the staff that he already had. He couldn't get changed, but he had already chosen them, hadn't he? Your Honor, I don't know that that's in the record as to whether he had chosen the staff. I'm trying to go through the Gupta factors. Do you see that's when I'm, I don't want to surprise you. Sure. So choosing the staff, preparing the billing in the manner he chose, and his own decisions regarding diagnosis, treatment, and operations, and his own judgment in those decisions. Those are the Gupta factors. So I'm trying to decide what in the record is contrary to the fact, would show that Kahn didn't have the same freedom that Gupta had. Yes, so in the management agreement, Section 2.1 says that it is Xenon who has the power to choose all of the staff, to credential them, to figure out where they go and what they do. Not to say Xenon, Xenon Texas, right? No, no, Your Honor. Xenon, hadn't he had the ability to choose the staff? I thought that the staff had to be the same while it's during the period before the job. No, Your Honor, and I'm quoting from 2.1 of the management services agreement that says big Xenon exclusively is going to provide the recruiting, the credentialing, and the scheduling of the anesthesia providers. It's going to exclusively do that. Is there any evidence in the record that Xenon did some type of medical control that was different than what Kahn wanted? Your Honor, I don't know of any specific evidence factually to that effect, but I do believe that from looking at the agreement itself and the control that invests exclusively in Xenon, that that factual determination didn't have to be made. So they could pick the staff, Xenon could pick the staff. Could he make his own decisions in diagnosis, treatment, and operations? Well, Your Honor, I don't think that he could because the quality control, the logistics, and regulatory compliance all exclusively in the power of big Xenon. Does the record show that Dr. Chaudhry or Xenon received profits made through Dr. Kahn's practice of medicine prior to Dr. Chaudhry obtaining his Texas license? Well, it doesn't show that any profits were actually received because, as Judge Werlein noted, this appeared to him to be nothing more than a noncommercial sham because Dr. Chaudhry admitted that the price of $750,000 as a flat fee that was supposed to be paid by Xenon Texas to Xenon in exchange for these management services simply couldn't have been paid. Dr. Chaudhry declined to testify about whether he thought the $750,000 could be paid at his deposition. Judge Werlein was proactive, took judicial notice of the fact that the only two clients that Xenon Texas had at the time were single practitioner clients in Texas and that there appeared to be absolutely no way that this brand-new business could possibly pay the $750,000 exorbitant fee, which was designed solely to ensure that any profits that came out would all go specifically to Xenon. The variation on these questions, though, is pervasive control sounds highly fact-specific. And if the sort of guiding cases are Flynn and Gupta, both those require trial for us to know whether there's control. So your position is that it's uncontroverted that control existed here, sufficient that Kahn was an employee of Chaudhry, right? Yes, Your Honor. Yet we've got factors that sound like they're sort of full of nuance. Is there enough control, and control of what, and who hires whom? I think so, Your Honor. So I guess the question is what's the case that allows this control question to be decided at the summary judgment stage? I think it's Flynn, but it's also Gupta. But Flynn had a full trial, right? Your Honor? Flynn was after a full trial. Flynn was after a trial, but the court's considerations were primarily based on the plain language of the agreements themselves. So if I could just point out, in Gupta there was doctor being able to hire and fire staff as he saw fit, which wasn't allowed in this instance. In Gupta, the doctor had the ability to determine how to complete billing requirements. In this case, the management agreement says Xenon exclusively manages billing. Is it relevant at all that Hashim in his affidavit says we weren't following Chaudhry at all? The man behind the scenes was Mr. Baig. I don't believe so at all, Your Honor, because the contract is the operative document, or the contract's the operative documents here, and they do speak for themselves. But I would note in addition that Judge Werlein didn't just look at the actual contracts themselves. He also looked at the undisputed facts in front of him, the $750,000 sham amount, judicial notice of the fact that the $750,000 couldn't be paid, the fact that Dr. Chaudhry himself admitted the paper owner. Was the Flynn-Gupta sort of this dialectic? Was it argued below or has their position been exclusively that as a doctor he is licensed and therefore the question of control is irrelevant? Judge Higginson, I think that that is the issue. I don't think that that issue was argued below. I think the only issue that they're presenting is whether or not a doctor who's not licensed in the State of Texas can possibly violate the act. And I think, as you pointed out, the definition itself shows you have to be licensed by the board in Texas, and that's the resolution of the question. That's not as good of an argument as the Gupta argument, is it? Well, Your Honor, I think that by being able to distinguish Gupta by showing all these additional factors and if we look at the Flynn case, the factors that the court decided in Flynn, the corporation had the sole power to hire staff. We have that here. The corporation collected two-thirds of the doctor's net profits. Here we show this was designed so that Xenon, Big Xenon, kept everything for itself. And then the list goes on in our case from Flynn. There's complete management of all funds for Xenon Texas that goes to Xenon. Xenon was the one who was paying everyone that Xenon Texas supposedly hired through its own funds. Back on the inextricably intertwined, because to me that's the most difficult part of your argument. If the purchase and sale agreement were the only contract we were looking at, would you have any argument to make that this was the unauthorized practice of medicine? I believe so, Your Honor, based on the fact that the purchase and sale agreement has these additional terms that provide control and have these strings over Xenon Texas. Well, right, but control would be fine once child free is licensed, and that's the condition precedent built into paragraph 2.5 or whatever it is. So how could that document with the exhibit ever equate, without the management agreement, to the unauthorized practice of medicine by someone who's been licensed? Well, and that's the key distinction, is once he's licensed. If he was licensed at the time management— Okay, so in other words, if there were no management agreement in this case, that purchase and sale agreement, you wouldn't have the argument that you have now. I disagree, Your Honor. I believe that the distinction is the licensing at the time the agreement was signed. So to your point, if at the time that the purchase and sale agreement was signed, he already had his license, then I don't think I'd have a good point. I thought that that's exactly the timing. I thought October 9th—I thought he got his license, like, October 1, and then he was compelled by court with arrest and contempt to sign it eight days later. Your Honor, and all of that happened after the fact. So all the allegations—and that's correct—all the allegations in this case pertain to at the time the document was signed, was it void as a matter of public policy? And I don't know why the State court made a finding that because he had his administrative license, that at the time he could sign over the equity interest agreement. What I can say to the court is that it's very confusing, but it is clear from the Texas Court of Appeals the issue of whether these contracts were illegal at the time they were signed was never considered by the State courts. It was never considered. And I'd just like to point specifically to the record in that. That's at record 3358. This is the Texas Court of Appeals opinion. So the State court enters judgment against Dr. Kahn. Dr. Kahn appeals it. The Court of Appeals, in considering Dr. Kahn's brief, notes that Dr. Kahn filed a motion to supplement his brief. That, for the first time, is when he decided to raise the argument that the agreements were void from their inception as a matter of public policy. The Court of Appeals specifically denied that motion, and the language it used to deny it is because they found that he had not raised it in opposition to the motion for summary judgment below. So as a result of the finding by the trial court that he could sign the document, they're encouraging the signing of the document. So obviously they don't think it's problematic. What I would say, Your Honor, is that nowhere in any of those State court opinions do they expressly consider this issue of whether it was legal at the time it was signed. I agree it should have been raised by someone, but it wasn't. If it had, I expect that those State court opinions would have analyzed Gupta, would have analyzed Flynn, and all the operative cases that address this issue. But they didn't, and to erase any doubt, the Court of Appeals came back and made it clear for us that in its opinion, in its holding, these issues were not raised definitively. I don't understand the answer that you gave, that the purchase and sale agreement would be illegal apart from the management agreement, because I don't understand what – can you explain to me what conditions came to pass in that before he was licensed that would make it problematic? Yes, Your Honor. For the purchase and sale agreement itself in a vacuum. So if the purchase and sale agreement itself were signed at a time, as they were, when Dr. Chaudhry did not hold a license to practice medicine in Texas, the question then is, is he or Xenon maintaining such control over Xenon Texas and Dr. Khan, such that, again, this is a sham transaction? So the analysis remains the same. The facts that the judge found, Judge Werlein found, of this being a sham. What's the control in the purchase and sale agreement? Because it says that he's got to get his license before the relevant medical parts kick in. The purchase and control in the sales agreement says that the owner of Xenon Texas  until a closing that's not defined in the purchase and sale agreement eventually takes place. It's keeping a status quo until something that needs to happen under Texas law happens. Why isn't that a good way to look at it? Well, Your Honor, because I don't think that the agreement itself can be looked at in a vacuum. I think we have to take the concession by the appellants that they were doing all of this at the same time. Agreements are all dated and signed at the same time. But that wasn't the premise of the hypothetical that Judge Higginson asked you. Specifically, if there was just the purchase and sale agreement, what's the offensive thing in it? And I don't know in a vacuum what the offensive thing is still. So I believe that in the purchase and sale agreement, the fact that with no time for closing, he's unable to take any distributions. He can't institute any lawsuits on behalf of the company. He can't sell, lease, license, or dispose of any assets. He can't incur any indebtedness whatsoever. This is on, Your Honor, from the agreement 2325 is the page I'm citing. This is the laundry list of the things that Xenon Texas and Dr. Kahn can't do until this undefined closing takes place. And so I submit that under the same analysis, which is do all of these strings that are held by Xenon, big Xenon, demonstrate that this agreement, standing in and of itself, also would have violated the factors that are set forth in Gupta and in Flynn. And I believe that they do, Your Honor. What about medical things? Your Honor, I think the analysis that the Court made with respect to the danger of having control over the company pertains more to whether or not you're going to have people who aren't familiar with Texas regulations and licensing in terms of medical practice who are coming in solely to make profit. So we have Xenon Texas, who's indisputably providing these medical services, and it's big Xenon who's stepping in to do something that they know they can't do because there's no medical license in Texas yet trying to accomplish this end runaround. And I think each of these agreements independently can show all of these strings that tie back to Xenon so that Xenon Texas doesn't have any control over what it does. Xenon Texas can't even take a distribution. Dr. Kahn can't say, We had a great month. We have a surplus of funds. I'm going to take a distribution because I'm the sole owner of this company. He can't do it. Why? Because there's a string that ties back to big Xenon. Let me ask you, didn't Dr. Kahn give Chaudhry the right to sign his name on any document? Indeed he did, Your Honor. Could he have signed Kahn's name to the purchase agreement? By the language of the delegation of signature found in the record at 2339, yes, Your Honor, I believe he could. And Judge Werlein in particular spent a lot of time on that in his opinion. And the appellants, I note in their brief, don't mention the delegation of signature authority at all. That delegation of signature authority says that the person who signs on behalf of Xenon Texas is big Xenon and Dr. Chaudhry. They sign all the contracts. They keep all of the control. So you can look at the delegation of signature authority as essentially the glue that helps stick all of these different agreements together. If he had the right to sign for Dr. Kahn, I mean, at the very outset of the deal, he had the right to sign that over. I agree, Your Honor. He had the right essentially to do anything that he wanted. And really the question, I think, is what was left that Xenon Texas and Dr. Kahn could do after all these agreements were signed and all these strings were firmly attached to them? And I submit that it was really nothing. Just finally, Your Honor, to address the privity and the virtual interest argument, I would just note that the bankruptcy court itself, which is where that argument was raised for the first time, actually granted the motion to dismiss Dr. Kahn's bankruptcy proceeding. So I submit that clearly the bankruptcy court wasn't compelled by that virtual interest argument, nor is there any state court or other holding where that was found to have existed. Okay. Your Honor, for all vote, thanks. Okay. Back to you, Mr. Sherry. Your Honors, this is the problem when the person who writes the appellee's brief is not the person who engages in oral argument. Mr. Sherry has raised some very interesting arguments, potentially, about allegedly there being provisions of the purchase and sale agreement that supposedly went into effect at the time the agreement was signed. He also talks about the delegation of signature authority. Neither of those points, none of those points were raised in appellee's brief. So, frankly, I did not have the opportunity to respond to them. On the contrary, the reason this case is in such an interesting and unusual posture is because the appellee's brief doesn't challenge our facts, doesn't dispute or challenge our issues presented, doesn't dispute or controvert any of our arguments. Now, Judge Davis just said something about the delegation of signature authority and whether or not Dr. Chowdhury could or could not have signed on behalf of Dr. Ali Kahn. There's nothing about that in the record. There's no discussion. And there would need to be evidence in order for us to even address that issue. I think the contract is in the delegation is in the record, isn't it? The delegation of authority is in the record, Your Honor. But I would argue, and I'm only arguing this because it was raised here. It's not our court. It's all over the district court's opinion. The district court talked about the delegation of authority. But the district court did not take the position that under the delegation of authority, it went into effect even before the other agreements were signed. In fact, it did not. So that's the point that I was addressing, Your Honor. Dr. Chowdhury could not have signed on behalf of Dr. Ali Kahn, their initial agreement. Kennedy. So the delegation of authority to sign was executed sometime later? No. It was executed contemporary. There's nothing in the record, Your Honor. I believe it was executed contemporaneously. But that's another point, Your Honor. Mr. Sherry says that the agreements were all signed and dated at the same time. That's not true. The equity interest assignment agreement by its very terms was not to be signed and dated or go into effect unless and until the Dr. Chowdhury obtained his Texas medical license, and therefore, the purchase and sale agreement was supposed to go into effect. What it boils down to also is I believe that if you listen to what Mr. Sherry said, he focused very much on terms and provisions of the exclusive management services agreement, but he couldn't answer because there is no answer to the fact as to how an agreement that was not in effect, that could not go into effect because of the termination of the agreement by Dr. Ali Kahn because of what we allege his cousin Mirza Baig did, the fact is that agreement never went into effect. And therefore, it was we were forced to bring, Dr. Chowdhury was forced to bring a breach of contract action, and that's what the Texas court talks about. He also mentions what the Texas court of appeals said and claims that this issue wasn't discussed, but in affirming the final judgment of the Texas state courts, the court of appeals specifically referenced the district court's order and added that the order, quote, is not binding or controlling authority for the case at bar. And that's in the record at page 3357, note 1. So clearly, the Texas court of appeals did look at the arguments that were raised by Mr. Baig and that Judge Wehrlein accepted and decided that those were not arguments they were going to take. The final point I'd like to make is that there is no evidence in the record. Final two points. A, there is no evidence in the record as to what was or wasn't done regarding medical practice by either Dr. Ali Khan, Dr. Chowdhury, or Zenon. And the last point, I notice my time is up, if I may just finish the sentence. There's a big distinction between the Flynn case and our case. The two agreements in the Flynn case were a partnership agreement and a similar management services agreement, both of which went into effect simultaneously and monies were paid to the non — were paid out at that time. Here we have a very different situation. Besides the fact that there were no doctors involved in Flynn, that the corporation was run by laypersons, whereas here the corporation was run by a licensed physician, as we've said time and time again, the purchase and sale agreement and the equity interest assignment agreement did not go into effect and could not go into effect until much later on. Thank you. Kennedy. Thank you very much. Thank you for your argument.